UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

SOUTH FIFTH TOWERS, LLC                                              PLAINTIFF

v.                                                    CIVIL ACTION NO. 3:15CV-151-CRS

ASPEN INSURANCE UK, LTD., et al.                                    DEFENDANTS

**MEMORANDUM OPINION**

This matter is before the court on motion of the defendants, Aspen Insurance UK. Ltd. and Tenco Services, Inc. (collectively "Aspen" herein), for summary judgment in this action for breach of contract and unfair claims settlement practices in Aspen's denial of coverage under a commercial property insurance policy for Kentucky Towers, a residential apartment building in Louisville, Kentucky. DN 109. The plaintiff, South Fifth Towers, LLC ("South Fifth"), the insured and owner of Kentucky Towers, has responded, and has also moved for leave to file a sur-reply. DN 120.

The mythical creature, the Sur-Reply, has surfaced in this case.[1] The proposed additional brief seeks to address "new-found argument and factual misstatement" in Aspen's reply brief. South Fifth does not identify any "misstatements" in Aspen's reply, but, in any event, "the desire to correct statements made in a reply does not warrant a sur-reply." *Jones*, 185 F.Supp.3d at 966. Further, South Fifth's concern is with certain evidence submitted in support of Apsen's summary

---

[1] *Jones v. Perry County Fiscal Court*, 185 F.Supp.3d 947, 966 (E.D.Ky. 2016)("Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially "[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated." *Quoting, Key v. Shelby County*, 551 Fed.Appx. 262, 265 (6th Cir. 2014)).

judgment motion. South Fifth questions the admissibility of certain photographs which were appended as an exhibit to its motion for summary judgment (DN 109-15).

South Fifth contends the photographs were not produced during discovery. Apparently copies of such photographs were requested by South Fifth in its Request for Production of Documents, to which Aspen replied that it would produce non-privileged photos at an agreed upon time and place. DN 120-3. The sur-reply does not, however, seek to strike the photographs, but rather states that the defendants did not provide the photographs in discovery and must supplement their disclosures if they seek to use them. DN 120-2, p. 2.

South Fifth's motion for leave to file a sur-reply is improper and will be denied. We note, however, that Aspen admits that the photographs are unnecessary, as the sworn statements which the photographs accompany "suffice as evidence on this point." DN 121, p. 4.

On June 26, 2013, there were heavy thunderstorms lasting most of the day in Louisville, Kentucky. At approximately 5:15 p.m., the maintenance manager for Kentucky Towers, Kevin Landrum, was notified that water was coming in through the ceiling in the beauty shop on the first floor. Landrum Evidence Under Oath ("Landrum EUO"), p. 40-41. Landrum then went up to the second floor where he was able to determine that it was coming through the ceiling from within a closet. Landrum EUO, p. 41. Due to the amount of water coming in and the fact that it was dark,[2] all he could tell at the time was that water was coming through a drain pipe. Landrum EUO, p. 42. Landrum contacted Coit Cleaning who arrived within an hour. Landrum EUO., p. 48. Coit Cleaning and Landrum removed the water from the affected carpeted areas that evening using extractors and shop vacs. Coit left a circulating fan running overnight. Landrum EUO, pp.

---

[2] There has been evidence offered concerning the deplorable condition of the second floor which was vacant at that time. We need not go into detail concerning this evidence as it is immaterial to this decision. It is pertinent that the space was vacant, however, as Landrum's initial trip to the second floor to investigate the source of the water intrusion was hampered by the fact that there was no electricity on the floor.

52-53. Landrum stated that, at its deepest, the water was approximately one inch deep nearest the point of ingress, *ie*. the closet, and that it ran down the hallways to the left and right and into a number of apartment spaces, becoming progressively shallower the further it traveled from the source. Landrum EUO, pp. 54-58; Ex. E6-A. Landrum notified one of the principals of South Fifth, Aaron Parnes, in New York about the incident on the 26th. Landrum depo., pp.52.

The following day, Landrum was able to determine that the water was coming from a separation between two sections of pipe up near the roof. There is apparently a flat roof above the second floor on which there is a roof drain. Landrum explained that the separation occurred where the roof drain meets the vertical pipe which carries the rainwater through the building interior to the basement and into the sewer. Landrum EUO, pp. 43-45. Upon discovering the separation, Landrum "filled the pipe and filled it with cement" and "stuffed some rags down there so that way the cement would have something to bond to…" Landrum EUO, pp. 43; 46. The separation described by Landrum is the asserted cause of loss which forms the basis for South Fifth's claim for coverage under the policy.[3]

After being notified of the incident, Parnes notified his insurance broker, Judah Perlstein, on June 26 or 27, 2013. Perlstein recommended to Parnes that South Fifth engage a public adjuster, Richard Michelson of Risco, Inc. which Parnes did on South Fifth's behalf. Perlstein stated that he "got a PA because insurance companies are always looking for a reason not to pay." Perlstein depo., p. 47. He stated that "This was in Kentucky. I knew I have a client that I have to protect." *Id.* Michelson, in turn, recommended that Parnes engage a remediation company, The Drying Team. Parnes hired The Drying Team to perform remediation work for South Fifth. Parnes

---

[3] Details concerning the policy follow the discussion of the events herein. The Notice of Loss submitted to Aspen that there were 2 "burst" pipes which caused the loss. For purposes of this opinion, we need not address this apparent misinformation. The question of coverage has been argued and will be resolved on the questions of prompt notice and the so-called "rain limitation" as it applies to the presumed separation of a rainwater drain pipe up near the roof.

3

depo., pp. 21-25. Beginning on July 8, 2013, The Drying Team, with its subcontractor, Case Cleaning & Restoration Co., brought in eighteen employees and performed extensive demolition of the second floor. Baldrick/Eyle July 12, 2013 Tenco Preliminary Report, DN 109-4.

Perlstein was kept up-to-date on the developments at the Kentucky Towers by the public adjuster, and he was made aware by July 5, 2013 that The Drying Team had been engaged by South Fifth to perform remediation work. Perlstein did not notify Aspen of the loss until July 8, 2013, 12 days after Parnes called him. The Property Loss Notice sent by Perlstein's firm stated that the date of loss was July 5, 2013, and described the loss as follows:

> Loss was caused by a broken pipe/2 areas burst. A pipe leading from the roof drain through the building burst as did an ancillary pipe on the 2nd floor (per email)

Perlstein depo. Ex. 10, DN 109-7, PageID #2151. This information was taken from an email sent by Tanya Michelson, for Risco, indicating that two pipes "burst." Perlstein depo., pp. 62-63. When Perlstein was asked why it took twelve days to notify Aspen of the loss and why the notice stated that it occurred on July 5, 2013, he stated "[W]hen we found out about the loss, we made calls, sent out some e-mails, waited until we got the actual report, and then we reported to the carrier." Perlstein depo., p. 54. He stated that his secretary put the notice of loss together and that she "could have made a mistake" as to the date. Perlstein depo., p. 58. There was also some suggestion that there was delay due to the 4th of July holiday and the office being closed.

Two days after receiving notice of the loss, Aspen had adjusters on site at Kentucky Towers, but by that time most of the second floor had been demolished, the purported source of the intrusion had been altered and obscured, and there was virtually nothing left for Aspen's representatives to inspect to assess the cause of the water intrusion or to evaluate the extent of

the damage and extent of remediation needed. The demolition on the second floor was "98% done." Eyle depo., p. 90.

Samuel Eyle was one of the adjusters with Tenco Services, Inc. ("Tenco"), an independent firm engaged by U.S. Adjustment Corp. ((USAC"), Aspen's claims administrator, to investigate, consult, and assist with the claim. Eyle and another adjuster, Eugene Boldrick, arrived on the scene on July 10, 2013. Eyle was asked in his deposition whether he believed that some demolition was justified based on what he observed. He responded "Well, you got to remember, I didn't observe any damage, uh, to the areas where the pipes were located, so I can't say for certain that that's -- that's the case or not." Eyle depo., p. 47.

The Tenco adjusters authored a preliminary report on July 12, 2013 to USAC which indicated that Landrum had "discovered that a 4" gray water pipe on the north side of the building had developed an approximate 25" crack. At the same time on the south side of the building, also above the second floor, a 10" diameter storm water pipe failed causing rain water to enter the building." Eyle depo. Ex. 7, DN 109-4, PageID #2096. South Fifth states that Landrum never reported that a second water intrusion occurred. Landrum did, however, show the adjusters a pipe with a 25" breach located on the other side of the second floor from the place of the water intrusion from the roof drain. The report noted that there was a question as to how many losses were actually involved. The adjusters' preliminary report confirmed that "the Louisville, KY area sustained thunderstorms and rain, sometimes heavy, throughout the course of the day with rainfall amounts recorded of 2.69 inches for the day." *Id.* The report stated:

> We have inspected the first two floors of the building and have taken the attached photographs documenting our findings. We have found multiple areas of old mold growth and evidence of dozens of plumbing repairs in the ceilings above both floors. We also noted many areas on the ceilings showing heavy rust stains from metal lath in the plaster, which is obviously old damage. The gray water pipe on the north side of the second floor that ruptured was obviously damaged

5

due to age and rust. We also found the same situation with the storm water pipe on the south side of the building on the second floor…

Our concerns are as follows:

How many losses are actually involved?
Is this a sudden event or an ongoing continual problem?
How did both events occur at the same time?

*Id.* The report then stated, "As a result of our investigation, we contacted you to express our concerns with this loss. You gave us permission to enlist the services of an engineer. We have contacted Donan Engineering who will conduct an inspection on July 12, 2013." *Id.*

At this point in the claims process a more in-depth investigation into the incident began. Two engineering firms were retained to evaluate the property. The only eye witness, Landrum, identified the pipe separation as the sole cause of the water intrusion, and the experts verified Landrum's statement to the extent possible without being able to independently view the separation due to the cementing over of the pipe. Based upon the testimony of Landrum as to the amount and location of the water on July 26, 2013 and low moisture readings obtained on July 16, 2013 in drywall marked for demolition but not yet removed, the necessity for the extensive demolition of the second floor was deemed highly questionable. Apparently, The Drying Team did not compile moisture readings or other evaluative data. They took moisture readings and redlined maps.[4] Landrum testified that various readings were taken at the time sheetrock was marked for demolition. Landrum EUO, p. 61; Tarpley[5] depo., pp. 38-39; 65. There is significant debate among the parties over the "science" of moisture detection and the processes of remediation. This dispute illustrates the disadvantage which Aspen faced in attempting to gauge the condition of the property prior to demolition when it was prevented from performing

---

[4] Apparently redline mapping consists of taking moisture readings and marking red, yellow, or green on locations on a map of the space to designate for the demolition contractor areas in need of remediation.
[5] Scott Tarpley was a representative from The Drying Group who evaluated the remediation needed as a result of the water intrusion.

6

any sort of physical inspection and evaluation of its own to determine the extent of remediation required. Not only was there no physical structure for the adjusters or engineers to see, but there was no supporting numerical data offered by The Drying Team to support its conclusions, evidenced by the redlining on the maps, that the demolition was necessary. It appears that the only non-conclusory, information obtained with regard to the condition of the property was that of Landrum concerning the amount and location of the water at the time of the incident, and the moisture readings obtained by engineer Brent Easterwood on July 16th of the few areas not demolished. Aspen determined that this limited information could not be reconciled with the extensive remediation which was claimed to have been required. Aspen declined coverage for the claimed loss represented by South Fifth to be "at least the sum of $1,312,091.04." March 24, 2014 Sworn Claim of Loss.

On September 15, 2015, Aspen, through its administrator USAC, declined coverage to South Fifth by letter, invoking various provisions of the policy, including the prompt notice requirement and the rain damage limitation.

South Fifth filed suit against Aspen and Tenco in the Jefferson County, Kentucky, Circuit Court alleging (1) breach of contract by Aspen and asserting a claim for indemnification; (2) violation of the Unfair Claims Settlement Practices Act, common law bad faith, and negligence against both defendants; and (3) a third-party beneficiary claim against Tenco. The action was removed to this court under our diversity jurisdiction. DN 1. Aspen has now moved for summary judgment, contending that there is no coverage under the policy and therefore summary judgment should be rendered in its favor on all claims.

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "[W]here the moving party has the burden—the plaintiff on a claim for relief or defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotations and emphasis omitted).

The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Aspen's first argues that there is no coverage because South Fifth failed to provide Aspen timely notice of the loss.

The policy, WKA UK02705-00 Aspen Insurance UK, LTD Commercial Property Policy, was procured by Hershel Perlstein Insurance Company, South Fifth's New York retail insurance broker, through GLN Worldwide, a wholesale insurance broker, who accessed the Aspen policy through WKFC, the managing general agent for Aspen UK. DN 59, p. 3, n. 1, PageID #968; Portnoy[6] depo., pp. 4-5, 39-40; Perlstein depo., pp. 23-25, 34-35. Judah Perlstein was clearly acting for the benefit of his client, South Fifth, in securing the Aspen policy. Perlstein indicated that he negotiated quoted prices daily in attempting to attain better terms for his clients. Perlstein depo., pp. 34-35. Perlstein demonstrated that he was South Fifth's agent after being notified by

---

[6] Greg Portnoy was the President of GLN Worldwide.

Parnes of the loss, stating that he "knew he had a client to protect. I got a PA because insurance companies are always looking for a reason not to pay." Perlstein depo. P. 47. Those are clearly not the words of an agent of Aspen.

The policy states under "Loss Conditions" that "[the insured] must see that the following are done in the event of loss or damage to Covered Property: …(2) Give us [Aspen] prompt notice of the loss or damage. Include a description of the property involved. (3) As soon as possible, give us a description of how, when and where the loss or damage occurred." Policy, DN 109-1, PageID #2009. The Policy states on the facepage, "Please forward correspondence and claims to our Administrative Office: WFKC Underwriting Managers, One Huntington Quadrangle, Suite 4N20, Melville, NY 11747." Policy, PageID #1994.

The parties dispute whether, under the facts of this case, a period of twelve days from the date of the incident until notice was given to Aspen's agent, WKFC, constituted prompt notice, relieving Aspen of liability thereby.

Under New York law, "compliance with the notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Travelers Indemnity Co. v. Northrop Grumman Corp.*, 956 F.Supp.2d 494, 509 (S.D.N.Y. 2013). This is so whether or not there is prejudice. *Minasian v. IDS Prop. Cas. Ins. Co.*, 676 Fed.Appx. 29, 31 (2d Cir. 2017). However, under Kentucky law, "an insured's failure to promptly notify his insurer of claims against him does not automatically allow that insurer to deny coverage…Instead, the insurer must first show that it was prejudiced by its insured's actions." *Employers Reinsurance Corp. v. Mut. Ins. Co.*, No. CIV.A. 3:05-CV-556-S, 2007 WL 2407272 at *1 (W.D.Ky. Aug. 20, 2007), *quoting Jones v. Bituminous Casualty Corp.* 821 S.W.2d 798

(Ky. 1991); *Ashland Hospital Corp. v. RLI Insurance Co.*, 632 Fed.Appx. 271 (6th Cir. 2016)(same).

As there is a conflict, this federal court sitting in diversity must apply the Kentucky choice-of-law rules to determine which state has "the most significant relationship to the transaction and the parties" and "the greatest concern with the specific issue raised in the litigation." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct.1020, 85 L.Ed. 1477 (1941); *Travelers Property Cas. Co. of America v. Begley Co.*, No. 5:13CV-199-JMH, 2014 WL 4678754 at *5 (E.D.Ky. Sept. 18, 2014). Kentucky law instructs that, among the factors, the court should consider are the place or places of negotiating and contracting; the place of performance; the location of the contract's subject matter; and the domicile, residence, place of incorporation, and place of business of the parties. *State Farm Mut. Auto Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 879-80 (Ky. 2013).

Parnes, on behalf of South Fifth, located in New York, dealt with Perlstein, also in New York, who in turn negotiated with GLN located in New York. The application was executed in New York and the Aspen policy issued from WKFC's New York office. The domicile and residence of the principals of South Fifth is New York, but South Fifth is a Kentucky-registered LLC, and the subject matter of the contract, the Kentucky Towers is here.

Aspen's Notice of Removal indicates that South Fifth is defined as a citizen of New York by virtue of the New York citizenship of its principals, Parnes and Sternberg; Aspen is a citizen of the United Kingdom, and Tenco is a citizen of Tennessee. DN 1. This court found that South Fifth was a citizen of New York in an opinion entered November 24, 2015 in this case: "Parnes provided a New York address in his examination under oath, and Parnes testified that Sternberg lived in Lawrence, New York. Defs.' Sur-Reply Opp.Mot. Am. Compl. 8-9, ECF No. 29-

1…Indeed, the Defendants offer evidence that both Sternberg and Parnes are New York citizens…[T]he Court finds that Sternberg and Parnes are both New York citizens." DN 50, PageID #868.

While Kentucky has an interest in the satisfactory performance of insurance obligations concerning real property located within the Commonwealth, the authority cited in support of South Fifth's assertion that Kentucky law should be applied, *Schnuerle v. Insight Comm. Co.,* 376 S.W.3d 561, 567 (Ky. 2012) is of little assistance in reaching that conclusion. *Schnuerle* involved a proposed class action lawsuit concerning an internet service agreement which was executed by all members of the putative class in Kentucky. The internet equipment, internet service, and relevant service area were all in Kentucky and New York had no discernable connection or interest at all in the subject matter of the litigation whereas the court noted that Kentucky has a substantial interest in the protection of its residents in the area of commercial transactions, and one of the principle claims was noted to arise under the Kentucky Consumer Protection Act. By contrast, this is a private commercial transaction involving essentially, absentee landlords who negotiated and contracted for a policy of insurance entirely in New York. While the property is here, the issue concerning the bargained-for coverage is a matter of interest to New York. In any event, we conclude that under either New York or Kentucky law, prompt notice was not given, as required by the policy, and Aspen was significantly prejudiced by this failure.

The incident occurred on July 26, 2013. Parnes was immediately notified of the event by Landrum, and in turn Parnes notified his broker, Perlstein, on the 26th or 27th. The problem is that Aspen's agent was not notified, as required by the policy, until twelve days after the

incident. It is clear that notice to Perlstein was not sufficient to comply with the policy's "prompt notice" requirement. Notice to Perlstein did not constitute notice to the insurer.

> "An 'insurance broker' is one who acts as a middleman between the insured and the insurer, and who solicits insurance from the public under no employment from any special company, and who, upon securing an order, places it with a company selected by the insured, or in the absence of such a selection, with a company selected by himself; whereas as 'insurance agent' is one who represents an insurer under an employment by it." *Travelers Fire Ins. Co. v. Bank of Louisville*, 243 S.W.2d 996, 998 (Ky. 1951). The general rule is that brokers are the agents of the *insured*, not of the insurer, "in the absence of statutory or some special indicia of authority." *J. Inmon Ins. Agency, Inc. v. Ky. Farm Bureau Mut. Ins. Co.*, 549 S.W.2d 516, 518 (Ky.App. 1977).

*Griffin v. Middlefork Ins.* Agency, No. 17-215-DLB, 2017 WL 4413403 (E.D.Ky. Oct. 4, 2017). See *also, TV Realty, LLC v. Tower Ins. Co. of N.Y.,* 2016 WL 3913776, *1-2 (N.Y. Sup. Ct. July 11, 2016)(notice to public adjuster did not constitute notice to insurer); *J. Inmon Ins. Agency, Inc.*549 S.W.2d. at 519 (insurance broker is the agent of the insured, so notice to broker does not constitute notice to insurer). Perlstein's testimony illustrates that he acted as the agent of South Fifth. Perlstein testified as to his negotiations for favorable terms and pricing on behalf of his clients. He also contacted a public adjuster in Kentucky after South Fifth notified him of the Kentucky Towers loss because he "knew [he]] ha[d] a client that [he] ha[d] to protect." Perlstein depo., p. 47.

WKFC was the managing general agent for Aspen UK (Portnoy depo. p. 5). It did not receive notice of the June 26, 2013 loss until July 8, 2013. The policy instructs South Fifth that it "must see that the following are done in the event of loss or damage to Covered Property." The delineated tasks include the giving of prompt notice to Aspen. South Fifth did not promptly notify its insurer, nor did it see that it was done. Additionally, Perlstein's explanation that his

firm was waiting on information from the public adjuster, that there was an intervening Fourth of July holiday weekend during which their office was closed, and that there was a clerical error in stating that the date of loss was July 5, 2013 offer nothing to mitigate the lack of prompt notice. Perlstein admitted that notice could have been given earlier. Notice should have been given earlier, in light of the known remediation activities which were already taking place.[7]

The New York Supreme Court held in *TV Reality, LLC*, a case very similar on the facts to the case at bar, that notice given to an insurer fourteen days from the date of the loss in that case was not prompt, where the insured sought coverage for roof damage occurring during a storm with high winds and rain. The insured notified its public adjuster shortly after the loss, but by the time the *insurer* was notified and the insurer's adjuster arrived to assess the loss, the roof had been repaired and the debris had been removed.[8] The New York court noted that "[n]otice provisions in insurance policies afford the insurer an opportunity to protect itself…[T]his court noted that '[w]ithout timely notice, an insurer may be deprived of the opportunity to investigate a claim and is vulnerable t0 fraud.'" *TV Reality, LLC*, 2016 WL at *2-3.

This was precisely the issue faced by Aspen when South Fifth allowed a delay of twelve days in providing the required notice, and why the delay substantially prejudiced Aspen. The

---

[7] South Fifth has offered the expert report of Howard E. Wolf, a certified master restorer and restoration consultant with HW3 Group, LLC to bolster its position that prompt notice was given to Aspen. Whether this opinion is proper is open to debate. However, he states that "It should be assumed that the carrier and their representatives have particular interest in being actively involved in complex and high liability exposures." DN 108-1, p. 9. This observation supports the defendant's position that notice provided twelve days after the loss was not prompt, as Aspen's interests were thus compromised by the delay. Additionally Wolf's conclusion that prompt notice was given was based upon the faulty assumption that "the public adjuster filed an official claim within five days of the loss" ( *Id.*). Therefore his opinion as to prompt notice is meaningless.

[8] We note that South Fifth urges that upon the arrival of the Tenco representatives, there was demolition debris in dumpsters which could have been "inspected" for moisture content, but was not. Of course, any such inspection would have been wholly unhelpful in determining the location and condition of damage that existed pre-demolition. Apparently the suggestion is that the presence of *any* excessive moisture in any of the debris would justify *some* necessity for remediation. First, there is evidence in the record that it was raining on the day that Tenco arrived. This fact calls into question the possibility that any valuable information concerning moisture levels could have been obtained by testing the debris in the dumpsters. But more to the point, Aspen has never denied that there was a water intrusion on the first and second floors on July 26, 2013. The question was what remediation was necessary to remedy that intrusion. Sheetrock debris in a dumpster could not answer that question, and refute other evidence suggesting that the extent of the sheetrock removal was excessive.

purposeful action taken by South Fifth was to seal off the apparent source of the intrusion, immediately notify its own agent, engage its own public adjustor and its own remediation firm, and proceed with remediation. Indeed, the policy requires that the insured "[t]ake all reasonable steps to protect the Covered Property from further damage…" Policy, E.3, PageID #2009. However, contrary to the suggestion of South Fifth, this requirement and the requirement of prompt notice are not subordinated one to the other. They are, in fact, simultaneous obligations which must be satisfied. The fact that South Fifth determined that extensive remediation was necessary rendered prompt notice to Aspen all the more important. The failure to provide prompt notice in this instance where such swift and extensive remediation was done served to compound the prejudice to Aspen in this case. As already noted, Aspen's agents were unable to view the separation which was presumed to be the source of the water intrusion. They were unable to view the condition of the property after the incident because 98% of the purportedly damaged structures were already demolished. The lack of data from the remediation assessment further hampered Aspen's ability to gauge the nature and extend of the claimed loss for itself or to verify the facts presented by South Fifth.

On this basis, we conclude that Aspen has met the tests in both New York and Kentucky to establish prejudice in the failure to provide prompt notice of loss, and Aspen will therefore be relieved of liability under the policy. *Jones*, 821 S.W.2d at 802. We find support in the New York Court's decision in *TV Reality, LLC* finding that the fourteen-day delay in that case was prejudicial to the insurer, even though New York law did not require the court to make a finding of prjudice.

As an alternative ground for summary judgment, Aspen contends that the so-called "rain limitation" in the policy precludes coverage for the water intrusion in question as a Covered Cause of Loss. We agree.

The policy refers the insured to the "applicable Causes of Loss Form as shown in the Declarations." Policy, A.3.[9] The parties agree that Causes of Loss – Special Form[10] defines Covered Causes of Loss under this policy.

The Form states:

> **A. Covered Causes of Loss**
>
> …Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:
>
> 1. Excluded in Section B., Exclusions; or
> 2. Limited in Section C., Limitations
>
> that follow.

Section C contains the following limiting language:

> 1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section…
>
> c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not, unless:
>
> > (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow sleet, ice, sand, or dust enters…

The words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning. *Pryor v. Colony Ins.*, 414 S.W.3d 424, 430 (Ky.App. 2013). *Secura Ins.*

---

[9] Form CP 00 10 06 07
[10] Form CP 10 30 06 07

*Co. v. Gray Construction, Inc.*, 717 F.Supp.2d 710 (W.D.Ky. 2010) provides a concise primer on the principles to be applied in interpreting the contract.

> Under Kentucky law, the party seeking to establish coverage bears the burden of establishing that the incident at issue was within the scope of the policy. *North American Acc. Ins. Co. v. White,* 258 Ky. 513, 80 S.W.2d 577, 578 (1935). However, the burden is on the insurer to establish that an exclusion bars coverage. *Travelers Property Cas. Co. of America v. B & W Resources, Inc.,* No. 6:05–CV–355 KKC, 2006 WL 3068810, *4 (E.D.Ky. Oct. 26, 2006); *Kentucky School Boards Ins. Trust v. Board of Educ. of Woodford County,* No.2002–CA–001748–MR, 2003 WL 22520018, *9 (Ky.Ct.App. Nov. 7, 2003). Once the insurer has shown that application of an exclusion, the burden shifts back to the insured. *Travelers Property Cas. Co. of America v. B & W Resources, Inc.,* 2006 WL 3068810, *4 (citing *Smith v. State Farm Fire and Cas. Co.,* 656 N.W.2d 432, 436 (Minn.2003) and Lee R. Russ & Thomas F. Segalla, 17A *Couch on Insurance* 3d § 254:13 (2006)).
>
> The Kentucky Supreme Court has set forth two principles of insurance contract interpretation: "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and, (2) exceptions and exclusions should be strictly construed to make insurance effective." *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney,* 831 S.W.2d 164, 166 (Ky.1992) (quotation marks and citations omitted). Kentucky courts have also held that this rule of liberal construction does not mean every doubt must be resolved against the insurer; "the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract." *St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.,* 870 S.W.2d 223, 226 (Ky.1994); *see also Stone v. Kentucky Farm Bureau Mutual Ins. Co.,* 34 S.W.3d 809, 811 (Ky.Ct.App.2000) ("the terms should be interpreted in light of the usage and understanding of the average person"). Finally, in construing an insurance policy, the policy should be read as a whole. *Sun Life Ins. Co. v. Taylor,* 108 Ky. 408, 56 S.W. 668 (1900).

*Secura Ins. Co. v. Gray Const., Inc.*, 717 F. Supp. 2d 710, 714–15 (W.D. Ky. 2010), *modified on clarification* (July 12, 2010). For purposes of its summary judgment argument, Aspen has presumed that South Fifth has met its initial burden of establishing that the incident was within the scope of the policy and that the cause of the water intrusion was a separation of the vertical rainwater drain pipe from the roof drain at a place up near the roof.

The fact of the matter is that the water intrusion occurred during a heavy rainstorm. The policy does not cover damage to the interior of a structure or its contents caused by or resulting from rain. Thus, on its face, it appears that this clear and unambiguous limitation precludes coverage.

South Fifth postulates a number of reasons why this interpretation is not correct. First, it argues that because the incident was a water intrusion through a separated pipe, it would be improper to label it as "rain" so as to deny South Fifth the reasonable expectation of coverage for such an incident. South Fifth states that the "Defendants rely on an artificial technicality that the water source was rain, a layman's vernacular." DN 113, PageID #2408. This argument must be rejected. The evidence is that the pipe through which, or out of which, the water came was a rain water pipe attached to a storm drain near the roof. Water came in during a rainstorm. To suggest that it is arbitrary to employ the term "rain" in connection with the water intrusion in this case is nothing short of ridiculous.

South Fifth also argues as a general proposition that this "rain limitation" is commonly understood to apply to roofers who leave roof repairs open to the elements overnight. *Id*. This observation neither operates to limit the application of the provision to this incident nor assists in addressing the language at hand as it applies to the facts of this case. In fact, *Divine Motel Group, LLC v. Rockhill Ins. Co.*, No. 3:14-CV-31-J-34JRK, 2015 WL 4095449 (M.D.Fla. July 7, 2015), a case interpreting the standard form language which we address herein, belies the argument that the application of this provision is directed solely at roofers. *Divine Motel* involved the denial of coverage for a water intrusion occurring during a tropical storm.

South Fifth argues that "the rain was an event, however, the water intrusion was clearly the overrun and eventual mechanical failure of the roof drainage system." Wolf Exp. Rept.,

17

PageID # 1945.[11] This is an untenable distinction for a number of reasons. If we accept the fact that the mechanical failure was an "overrun" of the roof drainage system, the "mechanical failure" must necessarily have been "caused by…rain," inasmuch as the overrun was overrun by something – rain. If we attempt to hold the rain as an "event" separate from the mechanical failure, and look to that failure alone, we are still brought back around to the rain event, as we must look at the cause of the mechanical failure of the pipe. It was, by South Fifth's own suggestion, an overrun of the roof drainage system. That overrun was then *the result of rain*, as rainwater was what overran the roof drainage system which then caused the mechanical failure.

Having concluded that the water intrusion was "caused by or resulting from rain," we next look to one of the exceptions to the limitation.[12] The policy provides that a water intrusion caused by or resulting from rain is excluded "unless the building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain…enters." Aspen urges that the separation of the pipe is not a Covered Cause of Loss because the separation could only be caused by or the result of (1) wear and tear (B.2.d.1); (2) rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself (B.2.d.2); or (3) faulty, inadequate or defective maintenance (B.3.c.4), all of which are excluded under Section B of the special form.

We note that the preliminary report of the Tenco adjusters stated that "The gray water pipe…was obviously damaged due to age and rust. *We also found the same situation with the storm water pipe…*" Eyle depo. Ex. 7, PageID #2096 (emphasis added). South Fifth has identified nothing that would indicate that the claim falls outside these exclusions. *Secura Ins.*

---

[11] Again, we question the expert's offer of this opinion on contract interpretation, but address it inasmuch as South Fifth's argument is also premised on the factual distinction Wolf seeks to draw between the rain storm and the pipe separation.
[12] There are two exceptions delineated, but only the first could apply in this case.

*Co.*, 717 F.Supp.2d 714; *Divine Motel*, 2015 WL 4095449 at *7, n. 10. However, Aspen does not rely exclusively on this testimony to exclude coverage. Rather this and other testimony suggests that wear and tear, rust and corrosion impacted the pipe's condition. Having been unable to actually see the separation determined by Landrum to be the source of the water intrusion, Aspen cannot say with certainty whether the separation was the result of wear and tear, rust and corrosion. Indeed, the cementing over of the pipe prevented such inspection.

With respect to the "inadequate maintenance" exclusion, the policy states that "We will not pay for loss or damage caused by or resulting from [inadequate maintenance]. But if [inadequate maintenance] results in a Covered Cause of Loss, we will pay for the loss or damage caused by the Covered Cause of Loss." B.3.c.4. In this instance, as the separation was not discovered, Aspen suggests that inadequate maintenance resulted in the loss and therefore coverage is precluded. The exception which would take the loss outside of the exclusion would be if the inadequate maintenance resulted in a Covered Cause of Loss. That is not possible here, as the water intrusion resulted from rain when a rainwater pipe separated, and the policy does not cover damage to the interior of a structure resulting from rain.

As in *Divine Motel*, we find that "[t]he key factor missing from this circular argument is the identification of any loss that is *not* excluded from the Policy's coverage." 2015 WL 4095449 at *9.

The exception to the rain exclusion for a Covered Cause of Loss specifies that the building or structure must first sustain damage by a Covered Cause of Loss to its roof or walls through which the rain enters. South Fifth urges that the Covered Cause of Loss is the separation of the pipe from the roof drain, but in order to be able to argue that this was a sudden and accidental occurrence, as opposed to some precursory condition which would result in exclusion,

19

it urges that the separation resulted from the "overloading" or "overrun" of the roof drain by heavy rain. This argument conflates the exception with the limitation from which it is carved out. In arguing something other than the excludable causes of the separation (corrosion, rust, inadequate maintenance, etc.), South Fifth's "overloading" or "overrun" theory returns back to the rain limitation. Further, this explanation cannot satisfy the requirement that the property first sustain a Covered Cause of Loss to its roof or walls. Under South Fifth's theory, the separation was caused by the overrun of rain. Despite the fact that the rainwater pipe separated from a roof drain, there has been no showing of a Covered Cause of Loss to roof or walls.

South Fifth urges that since the separation was between a pipe and a roof drain to which it was attached, it has a reasonable expectation of coverage. This expectation is, however, not reasonable. First, South Fifth's reference to the roof drain clearly indicates that South Fifth would understand the source of the water intrusion to result from rain, and the policy does not cover water intrusions resulting from rain unless there is first roof or wall damage from a Covered Cause of Loss, but the fact that the separation was rain-induced or that it resulted from rain, South Fifth cannot argue its way around the rain limitation.

For these reasons, the court concludes that the failure of South Fifth to give prompt notice of the loss and the operation of the rain limitation in the policy preclude coverage for South Fifth's claim. As Aspen is entitled to summary judgment on the contract claim, South Fifth's claims for violation of the UCSPA, common law bad faith, negligence, and the third-party beneficiary claims fail as a matter of law. The motion of Apen for summary judgment will be granted and the action will be dismissed with prejudice by separate order.

**IT IS SO ORDERED.**

March 27, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**